UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

TTMI SARL,

                              Plaintiff,          Case No.:

              - against -                         **VERIFIED COMPLAINT**

FERROUS METAL COMPANY LTD,

                              Defendant.
------------------------------------------------------------X

Plaintiff TTMI SARL ("Plaintiff"), by and through its attorneys, Clyde & Co US LLP, as

and for its Verified Complaint against the Defendant FERROUS METAL COMPANY LTD

("Defendant"), alleges upon information and belief as follows:

1.       This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and also falls under this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. § 1333.

2.       At all times material hereto, Plaintiff was and is a foreign business entity duly

organized and existing under the laws of Switzerland.

3.       Upon information and belief, at all times material hereto, Defendant was and is a

foreign business entity duly organized and existing under the laws of Gibraltar.

4.       This action involves a claim for damages Plaintiff sustained for demurrage

incurred with respect to the M/V "BIC CLARE" (the "Vessel").

5.       On or about May 12, 2009, Plaintiff and Defendant entered into a Charter Party

pursuant to which Plaintiff chartered the Vessel to Defendant to transport iron ore concentrates

from the load port of Yuzhny, Ukraine to the discharge port in China. A copy of the Charter

Party is attached hereto as Exhibit "A."

6.     Pursuant to the Charter Party, it was Defendant's responsibility to load and unload the cargo at the load and discharge ports within the laytime allowed.  *See* Clause 9.1 of Part II of the Charter Party, hereto Exhibit "A."

7.     The agreed rate for demurrage was $30,000 per day, to be paid by Charterers.  *See* Boxes 22 and 23 of Part I and Clause 8.5.2 of Part II of the Charter Party, hereto Exhibit "A."

8.     Defendant breached the Agreement by failing to unload the cargo within the allowed laytime at the discharge port.

9.     As a result of Defendant's breach of the Charter Party, Plaintiff suffered damages in the total principal amount of $429,475.44, exclusive of interest, costs and attorneys fees, calculated as follows:  $489,863.00 (demurrage) minus $48,140.99 (despatch at load port) minus $12,246.58 (commission on demurrage) = $429,475.44.  A copy of the Invoice presented to Defendant itemizing the claim is annexed hereto as Exhibit "B."

10.     Defendant breached the Charter Party when, without authority and despite due demand, it failed to pay Plaintiff the $429,475.44 due and owing Plaintiff in accordance with the terms of the Charter Party.

11.     Plaintiff has complied with all terms and obligations of the Charter Party.

12.     The Charter Party provides that disputes arising under the Agreement are to be submitted to London Arbitration with English Law to apply.

13.     Plaintiff is in the process of commencing London Arbitration.

14.     Interest, costs and attorneys' fees routinely are awarded to the prevailing party in London Arbitration pursuant to English Law.  As best as can now be estimated, Plaintiff expects to recover the following amounts:

        A.     Principal claim                                      $      429,475.44;

| | | | |
|---|---|---|---|
| B. | Estimated interest on claim- | | |
| | 24 months at 6.5% compounded quarterly: | $ | 59,112.57; |
| C. | Estimated attorneys' fees and expenses: | $ | 71,695.34; |
| | Total: | $ | 560,283.35 |

15.     Upon information and belief, Defendant is and during the pendency of this litigation will continue to be engaged in international maritime commerce.

16.     International business transactions such as those engaged in by Defendant in the regular course of its business operations frequently require payments to be made in U.S. Dollars. *See e.g.*, Boxes 23, 24 and 28 of Part I of the Charter Party, Exhibit "A" hereto, requiring payment of demurrage, despatch and freight in U.S. Dollars.

17.     Upon information and belief, because Defendant is and will continue to be during the pendency of this litigation engaged in international commerce, it will continue to enter into business transactions requiring that the payments be made in U.S. Dollars.

18.     Upon information and belief, U.S. Dollar payments made pursuant to international commercial transactions of the type engaged in by Defendant frequently are made via electronic fund transfers in U.S. Dollars.  Approximately 95% of all electronic funds transfers between non-U.S. parties transacting business in U.S. Dollars are made via the Clearing House Interbank Payments System ("CHIPS").  These payments involve routing the electronic funds transfers through a CHIPS participating bank, usually located in New York City, operating as an intermediary bank, in order to convert the foreign currency into U.S. Dollars.

19.     Upon information and belief, because Defendant is and will continue to be during the pendency of this litigation engaged in international commerce, it will continue to make or receive some or all of the payments involved in that commerce in U.S. Dollars, and some or all

of those payments will be made via electronic funds transfers processed through the CHIPS system, and will be routed through a CHIPS participating bank located in New York City (within this District) in order to convert the foreign currency into U.S. Dollars.

20.    Under the law of the Second Circuit, electronic funds transfers to or from a party in the hands of an intermediary bank are considered to be the property of that party and can be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 436 (2d Cir. 2006).

21.    Accordingly, upon information and belief, Defendant has or will have during the pendency of this litigation assets in this District in the form of electronic funds transfers at banks located in this District.

22.    The Defendant cannot be found within this District within the meaning of Rule B but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

23.    The Plaintiff seeks an order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claims as described above.

WHEREFORE, Plaintiff prays as follows:

A.    That process in due form of law issue against Defendant, citing Defendant to appear and answer under oath all and singular the matters alleged in the Verified Complaint failing which default judgment be entered against it in the sum of $560,283.35;

B.     That since the Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all goods, chattels, credits, letters of credit, bills of lading, effects, electronic fund transfers, debts and monies, tangible or intangible, or any funds up to the amount of $560,283.35 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit, at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.     That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

E.     That in the alternative, this Court enter Judgment against the Defendant on the claims set forth herein;

F.     That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

G.     That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: October 14, 2009
        New York, New York

                              CLYDE & CO US LLP

                              By: _____
                              Christopher Carlsen (CC 9628)
                              405 Lexington Avenue
                              New York, New York 10174
                              Tel: (212) 710-3900
                              Fax: (212) 710-3950
                              Christopher.carlsen@clydeco.us

                              Attorneys for Plaintiff

## VERIFICATION

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

1.      My name is Christopher Carlsen.

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am a member in the firm of Clyde & Co US LLP, attorneys for the Plaintiff.

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my beliefs are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:      October 14, 2009
             New York, New York

                                            Christopher Carlsen

Sworn to before me this 14th day of October, 2009

Notary Public

PATRICIA A. DONNELLY
Notary Public State of New York
No. 01DO5087441
New York County
Expires Nov. 30, 2009

# EXHIBIT A

| 1. Shipbroker | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE STANDARD ORE CHARTER PARTY CODE NAME: "OREVOY" PART I |
|---|---|
| | 2. Place and date of Charter Party *Gibraltar, 12 May 2009* |
| 3. Owners/Disponent Owners/Time-Chartered Owners (indicate name, address & telex number) *TTMI Sàrl, Geneva, as T/C Owners Head Owners BIC Clare Shipping Ltd., Bahamas* | 4. Charterers (indicate name, address & telex number) *'FERROUS METAL COMPANY LTD.' FMC Unit 1/2, 37 Line Wall Road, Gibraltar* |
| 5. Vessel's name and flag *m/v BIC CLARE - Bahamas flag* | 6. Rate in tons per hour (load.) (Cl. 1.4.) |
| 7. Vessel's particulars, if required (Cl. 1) *See Clause 31* | 8. Present position and prior commitments, if known (Cl. 2.2.) *Vessel present enroute to Aqaba ex Fujairah ETA/ETS May 20/22 (discharging gasoil) ETA Yuzhny May 28/29th (pending transit delay, if any, at Bosporous) Sub agw/wp/uce* |
| 9. Laydays date (Cl. 2.1.) *28 May 2009* | 10. Expected readiness to load (Cl. 2.2.) |
| 11. Cancelling date (also state if other period of declaration of cancelling agreed) (Cl. 2.3.) *05 June 2009* | 12. Substitution (state "no" if not agreed) (Cl. 4) |
| 13. Cargo (a per cent. more or less in Owners' option unless other margin agreed) in tons of 1000 kilos (if full and complete cargo not agreed indicate "part cargo") (Cl. 5.1.) *Upto full and complete cargo iron ore concentrates - always excluding DRI/HBI/DRIP - always loaded as per IMO Regulations* | |
| 14. Advance notices (load. and disch.) (State number of running days' notice to be given and to whom) (Cl. 6) *See Clause 32* | |
| 15. Loading port(s)/berth(s) (Cl. 7.1.) *1 safe berth always afloat YUZHNY Charterers guarantee 14.0 m fw* | 16. Discharging port(s)/berth(s) (Cl. 7.2.) *1 safe port, 1 safe berth QINGDAO, RIZHAO or LIANYUNGANG in Charterers' option. Charterers guarantee discharge port suitable for the vessel and min. 14.3m arrival draft. Intention Rizhao or Qingdao.* |
| 17. Reduced voyage speed (state "no" if not agreed) (Cl. 7.2.) *No* | 18. Notice time in running hours (load. and disch.) (only to be filled in if 12 hours turntime use both ends agreed) (Cl. 8.2.1.) |
| 19. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and  b); if total laytime for load. and disch., fill in c) only) (Cl. 8.2.5. & 8.2.6.) | 20. Laytime exceptions (loading) (Cl. 8.3.1.) |
| a) Laytime for loading  *15,000mt wwd Shinc* | |
| b) Laytime for discharging  *15,000 mt wwd Shinc* | 21. Laytime exceptions (discharging) (Cl. 8.3.1.) |
| c) Total laytime for loading and discharging | |
| 22. Demurrage rate (loading) (Cl. 8.5.2.) *US$ 30,000.— per day pro rata* | 23. Demurrage rate (discharging) (Cl. 8.5.2.) *US$ 30,000.— per day pro rata* |
| 24. Despatch money (load. &/or disch.) (Optional; if agreed indicate rate of US$ 15,000.— on working time saved both ends  despatch money) (Cl. 8.5.3.) | 25. Freight tax (state whether for Owners' or Charterers' account) (Cl. 11.3.) *—* |
| 26. Agents at loading port(s) (Cl. 12) *See Clause 34* | 27. Agents at discharging port(s) (Cl. 12) *See Clause 34* |
| 28. Freight rate per metric ton (state whether fully or partly prepaid) (Cl. 13) *US$ 29.55 pmt basis Qingdao, Rizhao or Lianyungang* | 29. Freight payment (currency and when/where payable; also state beneficiary and bank account) (Cl. 13) *See Clause 29* |
| 30. General average shall be adjusted/settled at (Cl. 20) *London* | 31. Law and Arbitration (state 23.1, 23.2. or 23.3. of Cl. 23, as agreed; if 23.3. agreed state place of arbitration) (if not filled in 23.1 shall apply) (Cl. 23) *English law / Arbitration London* |
| 32. Brokerage commission and to whom payable (Cl. 24) *2.50 % address commission* | 33. Numbers of additional clauses covering special provisions, if agreed |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I including additional clauses, if any agreed and stated in Box 33 and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| *[signature]* ATTORNEY IN-FACT | |

Computer generated form printed by authority of The Baltic and International Maritime Council (BIMCO), Copenhagen, using software which is the copyright of Strategic Software Ltd.

**TTMI SARL**
15-17, Rue du Cendrier
Case postale 2076
1211 GENEVE 1

PART II
"OREVOY" Charter Party

**1.  Vessel**                                                                                                                                1

The Owners shall                                                                                                                          2

1.1.  before and at the beginning of the loaded voyage exercise due       3
diligence to make the Vessel seaworthy and in every way fit for the      4
voyage, with a full complement of Master, officers and crew for a       5
vessel of her type, tonnage and flag;                                            6

1.2.  ensure that the Vessel and her Master and crew will comply with     7
all safety and health regulations and other statutory rules or regu-      8
lations and internationally recognized requirements necessary to        9
secure safe and unhindered loading of the cargo, performance of      10
the voyage and discharge of the cargo.                                       11

The Vessel shall                                                                                                                         12

1.3.  be classed Lloyd's 100 A1 or equivalent unless otherwise agreed    13
in Box 7, the Owners exercising due diligence to maintain that class    14
during the currency of this Charter Party;                                      15

1.4.  be suitable for mechanical handling of the cargo and capable of     16
receiving the cargo at the rate (if any) specified in Box 6 and be      17
suitable for grab discharge (see also Clause 25), failing which Clause 6.3.   18
3. shall apply                                                                                 
and the Owners shall reimburse the Charterers any actual extra dis-    19
charge costs;                                                                                  20

1.5.  be equipped to meet the technical requirements if and as           21
specified in Box 7.                                                                          22

**2.  Laydays Date, Expected Time of Arrival (E.T.A.) and Cancelling**    23

2.1.  Laydays shall not commence before 00.00 hours on the date        24
stated in Box 9. However, notice of readiness may be given before      25
that date and notice time, if stated in Box 18, shall run forth-        26
with.                                                                                             27

2.2.  Present position of Vessel as per Box 8.                                  28
Commitments prior to commencement of this Charter as per Box 8.       29
Expected readiness to load as per Box 10.                                     30

2.3.  The Charterers shall have the option of cancelling the Charter     31
Party if the Vessel be not ready to load on or before twelve midnight   32
(24.00 hours) on the cancelling date stated in Box 11.                     33
If it appears that the Vessel will be delayed beyond the cancelling      34
date stated in Box 11 the Owners shall, as soon as they are in a       35
position to state with reasonable certainty the day on which the        36
Vessel should be ready, give notice thereof to the Charterers asking    37
whether they will exercise their option of cancelling the Charter        38
Party. The option must then be declared within 24 hours five (5) running  39
days                                                                                              
(unless otherwise agreed in Box 11) of the receipt by the Charterers   40
of such notice, but not earlier than twenty (20) running days before    41
the revised date of loadreadiness. If the Charterers do not then       42
exercise their option of cancelling, the seventh (7th) day after the    43
readiness date stated in the Owners' notice shall be regarded as a     44
new cancelling date. This provision shall operate only once, and       45
should the Vessel not be ready to load on the new cancelling date      46
the Charterers shall have the option of cancelling the Charter Party.    47
The Charterers shall in any event declare whether they exercise any    48
option of cancelling under sub-clause 2.3. no later than the time of    49
the Vessel's readiness to load.                                              50

**3.  Subletting, Assigning**                                                         51

The Charterers shall have the liberty of subletting or assigning this    52
Charter Party to any individual or company, but the Charterers shall   53
always remain responsible for the due fulfilment of all the terms and   54
conditions of this Charter Party and shall warrant that any such sublet  55
or assignment will not result in the Vessel being restricted in her      56
future trading.                                                                              57

**4.  Substitution**                                                                      58

The Owners shall have liberty to substitute a Vessel, provided that     59
such substitute Vessel's main particulars and position shall be sub-    60
ject to the Charterers' prior approval, which is not to be unreason-    61
ably withheld, but the Owners under this Charter Party shall remain    62
responsible to the Charterers for the due fulfilment of this Charter    63
Party.                                                                                         64
This Clause shall not apply if "No" inserted in Box 12.                     65

**5.  Cargo**                                                                              66

5.1.  The Charterers warrant that unless otherwise specified in Part I,  67
the cargo referred to in Box 13 is non-hazardous and non-dangerous   68
for carriage according to applicable safety regulations including      69

IMCO Code(s).                                                                                                                         70

~~5.2.  The Charterers shall have the right to ship parcels of different~~      71
~~qualities and/or for different receivers in separate holds within the~~       72
~~Vessel's natural segregation and suitable for her trim provided that~~        73
~~such parcels can be loaded, carried and discharged in accordance~~        74
~~with the Vessel's seaworthiness. Other means of separation of dif-~~        75
~~ferent parcels may be specified in Part I.~~                                            76

5.3.  Unless otherwise agreed in Part I, all quantities shall be expres-    77
sed in tons of 1,000 kilograms.                                                      78

**Advance Notices**                                                                       79

The Owners or the Master shall give notices of expected readiness     80
to load/discharge as specified in Box 14 to the parties named therein  81
and shall keep those parties advised of any alteration in expected     82
readiness.                                                                                   83

**6.  Port of Loading, Voyage, Port of Discharge**                          84

7.1.  After completion of prior commitments as may be stated in Box     85
8, the Vessel shall proceed to the loading port(s)/berth(s) as stated   86
in Box 15.                                                                                   87

7.2.  The Vessel shall carry the cargo with all possible despatch to    88
the port(s)/berth(s) of discharge stated in Box 16. However, unless    89
"No" is inserted in Box 17, the Owners may order the Vessel to pro-    90
ceed at reduced speed solely to conserve fuel.                               91
If the Charterers have the right to order the Vessel to discharge at     92
one or more ports out of several ports named or within a specific      93
range, the Charterers shall declare the actual port(s) of discharge    94
to be inserted in the Bills of Lading prior to the arrival of the Vessel   95
at the port of loading.                                                                   96
*Charterers to declare port of discharge latest 7 days prior ETA.*

7.3.  Only when the loading/discharging port(s)/berth(s) are not spe-    97
cifically mentioned herein, the Charterers warrant the safety of port(s)/  98
berth(s) nominated and that the Vessel will be loaded and discharged   99
always afloat.                                                                            100

7.4.  The Vessel shall be left in seaworthy trim for shifting between    101
berths and ports.                                                                       102

7.5.  Unless otherwise agreed, loading and/or discharging at two- or   103
more ports shall be effected in geographical rotation.                      104

**8.  Notices of Readiness, Laytime, Demurrage/Despatch Money**     105

8.1.  *Notice of Readiness*                                                            106

8.1.1.  *At loading port written Notice of Readiness shall be given to*   107
*either agents, shippers or their representatives when vessel is in all*
*respects ready to load at loading berth.*
*If loading berth is not available upon vessel's arrival at or off the*
*port written Notice of Readiness may be given upon arrival waiting*
*place off port, as designated by authorities. Owners / Master have*
*the option to tender Notice of Readiness whether in port or not,*
*whether in berth or not, whether customs cleared or not, whether in*
*free pratique or not, provided the vessel is ready to load the cargo in*
*every respect.*
~~At each port of loading and discharging notice of readiness~~    108
~~shall be tendered to the Charterers or their agents by Owners /~~
*Master on vessel's arrival at discharge port, whether in port or not,*
*whether in berth or not, whether in free pratique or not, whether*
*customs cleared or not, provided the vessel is ready to discharge*
*cargo in every respect,* ~~given to the Charterers or their Agents when the~~
~~Vessel is~~
~~in all respects ready to load/discharge at the loading/discharging~~    109
~~berth.~~                                                                                         110

*If upon berthing vessel is found not to be ready then laytime or time*
*on demurrage shall stop to count until such time that vessel is ready*
*in all respects.*

8.1.2.  If a loading/discharging berth is not designated or if such       111
designated berth is not available upon the Vessel's arrival at or off    112
the port, notice of readiness may be given upon arrival at the          113
waiting place at or off the port.                                                     114
However, if the Vessel is at that time prevented from proceeding to    115
the loading/discharging berth due to her inefficiency, weather, tidal   116
conditions, strikes of tugs or pilots or mandatory regulations, notice   117
of readiness may be given only when such hindrance(s) has (have)      118
ceased,                                                                                      119

8.1.3.  Notice of readiness may be given *at loading and discharging*    120

This document is a computer generated OREVOY form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, the text of the original BIMCO approved document shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

PART II
"OREVOY" Charter Party

ports on any day at any time, irrespective of official office hours, Saturdays, Sundays and holidays included.

### 8.2. Laytime

8.2.1. The laytime shall commence when notice of readiness has been given and after expiration of notice time, if any, provided for in Box 18.
Should the Vessel arrive at the (first) loading port and be ready to load before the date stated in Box 9, the Charterers shall have the right to start loading. The Charterers shall also have the right to load/discharge before the expiration of notice time. In either event during such periods only time actually used shall count as laytime or as time on demurrage.

8.2.2. The notice time shall run continuously.

8.2.3. The notice time, if any, shall only apply at first or sole loading and discharging port, respectively.

8.2.4. If total time for loading and discharging has been agreed in Box 19 notice time, if any, at port of discharge shall be applied whether the Vessel be on demurrage or not on sailing from the (last) loading port.

8.2.5. Separate laytime. - The cargo shall be loaded within the number of hours/days of 24 consecutive hours or at the average loading rate per day of 24 consecutive hours as stated in Box 19a).
The cargo shall be discharged within the number of hours/days of 24 consecutive hours or at the average discharging rate per day of 24 consecutive hours as stated in Box 19b).

8.2.6. Total laytime. - The cargo shall be loaded and discharged within the number of hours/days of 24 consecutive hours stated in Box 19c)

8.2.7. In the case of loading and/or discharging at more than one berth, laytime shall run continuously as if loading/discharging had been effected at one berth only but without prejudice to sub-clause 8.3.

### 8.3. Suspension of Laytime

8.3.1. Unless the Vessel is on demurrage, laytime shall not count

(i)   during periods excepted as per Boxes 20 and 21, unless used, in which case only time actually used shall count;

(ii)  for the duration of bad weather or sea conditions which actually prevent the Vessel's loading, discharging or the shifting between loading/discharging berths of the Vessel;

(iii) if so provided for in Clause 14.

8.3.2. Time shall not count as laytime or as time on demurrage whilst the Vessel actually moving from waiting place whether at or off the port or from a lightening place off the port, until the Vessel is securely moored at the designated loading/discharging berth.

*Both at loading and discharging ports any shifting time from waiting area / berth to the final loading and discharging berth and any waiting for first suitable tide not to count as laytime, even if the vessel is already on demurrage.*

8.3.3. Time lost due to inefficiency or any other cause attributable to the Vessel, her Master, her crew or the Owners shall not count as notice time or as laytime or as time on demurrage to the extent that loading or discharging or the matters covered by sub-clause 8.4.1. are thereby affected.

8.3.4. If pursuant to Clause 9.13. the Vessel has to vacate the loading/ discharging berth, notice time or laytime or time on demurrage shall not count from that time until she be in all respects ready to load/discharge and notification has been given to the Charterers accordingly.

8.3.5. If due to the matters referred to in sub-clauses 8.3.3. or 8.3.4., the Vessel loses her turn, time shall count again only as from 12 hours after notification of the Vessel's new readiness has been given to the Charterers or when loading/discharging resumes whichever may be the sooner.

### 8.4. Termination of Laytime

8.4.1. Laytime/Demurrage shall stop counting on completion of:

- for loading port;
loading operations and final draft survey for determination of cargo weight.

- for discharging port:
(a) loading/discharging at the relevant port, (b) cargo documentation and/or draft survey for determination of cargo weight, (c) equals to

elsewhere damage under Clause 10.2., whichever may be the later.

8.4.2. If required, the Vessel shall leave the berth as soon as possible within her control on completion of loading/discharging, failing which the Charterers shall be entitled to proved damages provided that if she then has to wait for reasons (b) and/or (c) above, there must be a place available at which she can safely wait, and any extra expenses shall be for the Charterers' account.

### 8.5 Demurrage/Despatch Money

8.5.1. Demurrage accrued under this Charter Party shall be considered as constituting liquidated damages for exceeding the laytime provided for herein. However, if the Vessel has been on demurrage for 15 days or more and no cargo has been loaded, the Owners shall have the option of cancelling this Charter Party. No claim which the Owners may otherwise have against the Charterers shall be prejudiced by the Owners exercising their option of cancelling.

8.5.2. Demurrage shall be due and payable by the Charterers day-by-day *promptly upon agreement on the amount* at the rate specified in Boxes 22 and 23 and in the manner provided for in Box 29.

8.5.3. Despatch money, if agreed upon in Box 24, shall be paid promptly by the Owners to the Charterers at half the demurrage rate or as otherwise agreed upon in Box 24 for *working time* laytime saved in loading and/or discharging

## 9.   Loading and Discharging

9.1. The Vessel shall be loaded and discharged as and where ordered by the Charterers.

9.2. If the Charterers have not nominated a suitable loading or discharging berth on the Vessel's arrival at the port, or if such berth should not be available, the Vessel is to wait at a suitable place at or off the port.
The Charterers shall have the right to designate a safe waiting place *off port,* otherwise the Master shall choose a waiting place using due diligence to minimize extra shifting costs provided for in sub-clause 9.4.

9.3. The Charterers shall have the right to load and/or discharge at two berths at each port or place subject to sub-clause 9.4.

9.4. Shifting. - Costs of moving the Vessel, including bunkers, in excess of those which would have been incurred if the Charterers had nominated a free loading or discharging berth on arrival, provided the Vessel arrives on or after the date stated in Box 9, and/or if all cargo had been loaded or discharged during one operation at the first berth only other than a lightening place off the port, shall be for the Charterers' account unless caused by the Vessel's default. Other costs on board the Vessel including wages and officers' and crew's overtime charges to be for the Owners' account.

9.5. The Owners or the Master shall in due time prior to commencement of loading submit to the Charterers (for their nominees) at the loading port a loading plan which shall be based on a reasonable number of shiftings between hatches and also meet applicable rules and regulations, including IMCO Code(s). The Charterers shall inform the Owners/Master of any special composition of cargo required in sufficient time to permit the Owners/Master to work out and submit such loading plan.

9.6. Prior to loading, the Vessel's holds shall be adequately cleaned for loading the contracted cargo.

9.7. The Charterers shall, always within the capacity of the loading installations, load and trim the cargo as per the loading plan, free of any risk, liability and expense to the Vessel. Any extra trimming and/or levelling required by the Master or Owners shall be performed at the Owners' expense and any time lost thereby shall not count as laytime/demurrage. Discharging, including shovel cleaning, shall be affected by the Charterers free of any risk, liability and expense to the Vessel.

9.8. The Vessel shall move along any one berth, as reasonably required by the Charterers, solely for the purpose of making any hatch or hatches available to the loading/discharging appliances at that berth, and costs on board the Vessel including bunkers, wages and officers' and crew's overtime charges shall be for the Owners' account. However, the costs of any necessary outside services shall be for the Charterers' account. Laytime or time on demurrage shall not be interrupted thereby.

9.9. The Vessel shall work day and night and during any time as may be excepted as per Box 20 and Box 21, as required by the Charterers.

This document is a computer generated OREVOY form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

180
181
182
183
184
185
186

187

188
189
190
191
192
193
194

195
196

197

198
199
200
201

202

203
204

205
206
207
208
209
210
211
212

213

214
215
216
217
218
219
220
221
222
223

224
225
226
227
228
229
230
231

232
233

234
235
236
237
238
239
240
241

242
243
244
245
246
247
248
249

250
251

121

122
123
124
125
126
127
128
129
130

131

132
133

134
135
136
137

138
139
140
141
142
143

144
145

146
147
148

149

150

151
152

153
154
155

156

157
158
159
160

161
162
163
164
165

166
167
168
169
170

171
172
173
174
175

176

177

178

179

PART II
"OREVOY" Charter Party

9.10. The Vessel shall, at her own risk and expense, open and close 252
hatches prior to and after loading/discharging and also during load- 253
ing/discharging as may be required by the Charterers to protect the 254
cargo, provided local shore regulations permit. If same, however, is 255
not permitted by local shore labour regulations, shore labour is to 256
be employed by the Charterers at their risk, liability and expense. 257
The Vessel shall furnish and give free use of sufficient light for deck 258
and holds, as on board. 259

9.11. The Charterers shall have the right to order the Vessel to leave 260
without having loaded a full cargo, always provided that the Vessel 261
be in seaworthy condition and that the Charterers pay deadfreight 262
according to Clause 13.7. 263

9.12. Overtime for loading and discharging to be for the account of 264
the party ordering the same. If overtime be ordered by Port Author- 265
ities or any other Governmental Agencies, the Charterers to pay 266
extra expenses incurred. Officers' and crew's overtime charges 267
always to be paid by the Owners. 268

9.13. In the event of loading/discharging being impossible due to 269
inefficiency or any other cause attributable to the Vessel, her Master, 270
her crew or the Owners and such impossibility continuing for more 271
than three consecutive hours, the Charterers shall have the right to 272
order the Vessel to vacate the berth and shifting from and back to 273
berth shall be at the Owners' expense and time. 274

10. **Stevedore Damage** - *see Clause 26* 275

~~10.1. The Charterers shall be responsible for damage (beyond ordi-~~ 276
~~nary wear and tear) to any part of the Vessel caused by Stevedores 277~~
~~at both ends. Such damage, as soon as apparent, shall be notified 278~~
~~immediately by the Master to the Charterers or their port agents 279~~
~~and to their Stevedores. The Owners/Master shall endeavour to 280~~
~~obtain the Stevedores' written acknowledgement of liability and to 281~~
~~settle stevedore damage claims direct with the Stevedores. 282~~

~~10.2. The Charterers have the right to perform any repairs of steve- 283~~
~~dore damage of any moment prior to or before the completion of 284~~
~~the voyage, but must repair stevedore damage affecting the Vessel's 285~~
~~seaworthiness before the Vessel sails from the port where such 286~~
~~damage was caused. 287~~

11. **Dues, Taxes and Charges, Extra Insurance** 288

11.1. *On the Vessel* - The Owners shall pay all dues, duties, taxes 289
and other charges customarily levied on the Vessel, howsoever the 290
amount thereof may be assessed. 291

11.2. *On the cargo* - The Charterers shall pay all dues, duties, taxes 292
and charges levied on the cargo at the port of loading/discharging, 293
howsoever the amount thereof may be assessed. 294

11.3. *On the freight* - Taxes levied on the freight shall be paid by the 295
Owners or the Charterers as agreed in Box 25. 296

11.4. *Extra insurance* - Any extra insurance on cargo actually paid 297
by the Charterers owing to Vessel's age, class, flag or ownership 298
shall be for the Owners' account and may be deducted from the 299
freight. The Charterers shall furnish evidence of payment supporting 300
any such deduction. Unless a maximum amount has been agreed in 301
Part I, such extra insurance shall not exceed the lowest extra pre- 302
mium which would be charged for the Vessel and voyage in the 303
London insurance market. 304

*The vessel is free of any extra insurance.*

12. **Agents** 305

At the port(s) of loading the Vessel shall be consigned to the Agents 306
as stated in Box 26 and at the port(s) of discharge to the Agents as 307
stipulated in Box 27, the Owners always paying the customary fees. 308

13. **Freight** 309

The freight at the rate stated in Box 28 shall be calculated on 310
*intaken quantity Bill(s) of Lading weight.* 311

~~13.1. Prepaid. - If according to Boxes 28 or 29 freight is to be paid 312~~
~~in advance, it shall be deemed earned and non-returnable Vessel and/or 313~~
~~cargo lost or not lost. 314~~
~~Bill of Lading showing "Freight prepaid" or the like shall not be 315~~
~~released until the freight has been duly paid. 316~~

~~13.2. After shipment. - If according to Box 29 freight shall be payable 317~~
~~within a number of days after shipment, the freight shall be deemed 318~~
~~earned as per sub-clause 13.1. 319~~
~~In such case Bills of Lading shall not be endorsed "Freight prepaid" 320~~

~~or the like, unless the freight has been paid.~~ 321

*The freight is payable 100 percent within 3 (three) banking days*
*after signing / releasing Bill(s) of Lading marked "freight payable as*
*per Charter Party dated 12 May 2009" to Owners' nominated bank*
*account against Owners' email or fax freight invoice. Owners'*
*original invoice to follow. In case Charterers require Bill(s) of*
*Lading to be marked "Freight prepaid" same to be released once*
*freight has been received by the Owners.*

*Freight deemed earned upon cargo being loaded on board*
*non-returnable irrespective of vessel and/or cargo lost or not lost.*

13.3. *Partly on Delivery.* - If according to Boxes 28 or 29 a percentage 322
of the freight shall be payable as per sub-clauses 13.1. or 13.2. the 323
balance shall be paid as per sub-clause 13.4. However, in such case 324
the total freight shall be deemed earned as per sub-clause 13.1. and 325
the Charterers shall not have the option referred to in sub-clause 326
13.4.1. 327

13.4. *On Delivery.* - If according to Boxes 28 or 29 freight is payable 328
at destination or on right and true delivery of the cargo, it shall 329
not be deemed earned until the cargo is thus delivered. 330

13.4.1. *On Delivered Weight.* - When the freight is payable on delivery 331
of cargo the Charterers shall have the option of paying freight on 332
delivered weight, provided such option be declared in writing before 333
breaking bulk and the weight be ascertained by official weighing ma- 334
chine, otherwise by joint draught survey. The Charterers shall pay 335
all costs incurred in connection with weighing or draught survey. 336
The Owners shall be at liberty to appoint check clerks at their own 337
expense. 338

13.5. *Deductions.* - The freight shall be paid in cash without discount 339
in the manner described in Box 29. The Charterers shall only be 340
entitled to deduct from the freight any freight advances made as per 341
sub-clause 13.6., despatch money *and extra insurance*, provided 342
properly documented *and agreed upon by the parties*, as per Clause 11. 343
4. 344

13.6. *Freight Advances.* - The Owners shall put the Agents at the load- 344
ing port(s) in funds to cover the Vessel's ordinary disbursements 345
for Owners' account, prior to the Vessel's sailing from the port(s) 346
of loading. Otherwise the amount shall be advanced by Charterers 347
and be endorsed upon Bills of Lading as advance freight, with the 348
addition of 2 per cent to cover interest, commission and the cost 349
of insurance. 350

13.7. *Deadfreight.* - If the Charterers fail to supply a cargo as speci- 351
fied in Box 13, deadfreight shall be payable but the Charterers shall 352
not be bound to supply cargo in excess of any quantity stated 353
by the Owners as the Vessel's capacity made available to the Charterers. 354
The laytime shall be calculated on that quantity. 355
The Owners/Master shall be entitled to clause Bills of Lading for 356
any deadfreight due. 357
If the Shippers/Suppliers state in writing that no more cargo will be 358
shipped, the Owners shall not need to have any such statement con- 359
firmed by the Charterers. 360

14. **Strikes and Other Hindrances** 361

In the event of any of the causes referred to in Clause 21.2. either 362
preventing or delaying or, being already in existence, threatening to 363
prevent or delay the loading of the cargo intended for the Vessel, 364
or its discharging, the following provisions shall apply: 365

14.1. *Loading Port.* - When the Vessel is ready to proceed from her 366
last port or at any time during the voyage to the port or ports of 367
loading or after her arrival there, the Owners may ask the Charterers 368
to declare that they agree to count the laytime as if there were to 369
be no such hindrance. Unless the Charterers have given such de- 370
claration in writing (by telegram or telex if necessary) on the second 371
business day after receipt of the request, the Owners shall have the 372
option of cancelling this Charter Party. If part cargo has already 373
been loaded the Vessel must carry it to the port of discharge 374
(freight payable on loaded quantity only) having liberty to complete 375
with other cargo on the way for the Owners' own account, but the 376
Owners are entitled to keep the Vessel waiting at the loading port 377
without time counting. In case of more than one loading port and 378
if the causes referred to above do not prevent the loading in all 379
ports, the Charterers are entitled to order the Vessel to proceed to 380
the second or subsequent port and there to load a full cargo; in 381
such event, the Owners are not entitled to cancel the Charter Party 382
as hereabove stipulated. 383

14.2. *Discharging Port.* - On or after the Vessel's arrival at or off the 384
port of discharge, the Vessel shall wait until any such hindrance is 385
at an end, the Charterers paying half demurrage after expiration of 386
the laytime (unless the Vessel is already on demurrage in which 387
event full demurrage remains payable) full demurrage being payable 388

This document is a computer generated OREVOY form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

PART II
"OREVOY" Charter Party

from the moment when the hindrance is at an end. 389

The Charterers shall have the option at any time of ordering the 390
Vessel to another safe port within 600 nautical miles' distance where 391
she can safely discharge without being detained by any reason of 392
enumerated above, Shifting time shall count as laytime or as full 393
demurrage time as the case may be. 394

The Charterers shall reimburse the Owners additional port charges 395
including pilotage and canal dues, if any, incurred thereby; however, 396
the Owners shall bear the costs of bunkers consumed. All conditions 397
of this Charter Party and/or the Bill of Lading issued hereunder 398
shall apply to the delivery of the cargo at the substituted port and 399
the Owners shall receive the same freight as if the cargo had been 400
discharged at the original destination. 401

15. Ice 402

_Loading Port_ 403

15.1. If the Vessel cannot reach the loading port by reason of ice 404
when she is ready to proceed from her test port, or at any time during 405
the voyage, or on her arrival, or if frost sets in after her arrival, the 406
Master - for fear of the Vessel being frozen in - is at liberty to leave 407
without cargo; in such cases this Charter Party shall become null 408
and void. 409

15.2. If during the loading the Master, for fear of the Vessel being 410
frozen in, deems it advisable to leave, he has liberty to do so with 411
what cargo he has on board and to proceed to any other port with 412
option of completing with cargo for the Owners' own account to any 413
port or ports including the port of discharge. Any part cargo thus 414
loaded under this Charter Party is to be forwarded to destination 415
at the Vessel's expense against payment of the agreed freight, pro- 416
vided that no extra expenses be thereby caused to the Charterers, 417
freight being paid on the quantity delivered (in proportion if lump 418
sum), all other conditions as per Charter Party. 419

15.3. In the case of more than one loading port, and if one or more 420
of the ports are closed by ice, the Master or Owners are to be at 421
liberty either to load the part cargo at the open port and fill up else- 422
where for the Owners' own account as under sub-clause 15.2. or to 423
declare the Charter Party null and void, unless the Charterers 424
agree to load full cargo at the open port. 425

_Voyage and Discharging Port_ 426

15.4. Should ice prevent the Vessel from reaching the port of dis- 427
charge, the Charterers shall have the option of keeping the Vessel 428
waiting until the re-opening of navigation and paying demurrage, or 429
of ordering the Vessel to a safe and immediately accessible port 430
where she can safely discharge without risk of detention by ice. Such 431
orders are to be given within 48 hours after the Owners or Master 432
have given notice to the Charterers of the impossibility of reaching 433
the port of destination. 434

15.5. If during discharging the Master, for fear of the Vessel being 435
frozen in, deems it advisable to leave, he has liberty to do so with 436
what cargo he has on board and to proceed to the nearest safe and 437
accessible port. Such port to be nominated by the Charterers as 438
soon as possible, but not later than 24 running hours, Sundays and 439
holidays excluded, of receipt of the Owners' request for nomi- 440
nation of a substitute discharging port, failing which the Master will 441
himself choose such port. 442

15.6. On discharge of the cargo at such port, all conditions of the Bill 443
of Lading shall apply and the Owners shall receive the same freight 444
as if the Vessel had discharged at the original port of destination 445
except that if the distance to the substitute port exceeds 100 nautical 446
miles, the freight on the cargo delivered at that port is to be in- 447
creased in proportion. 448

16. War Risks (~~Voywar 1950~~) - see Clause 34 449

~~16.1. In these Clauses "war risks" shall include any blockade or any~~ 450
~~action which is announced as a blockade by any Government or by any~~ 451
~~any belligerent or by any organized body, sabotage, piracy, and any~~ 452
~~actual or threatened war, hostilities, warlike operations, civil war, 453
~~civil commotion, or revolution. 454

~~16.2. If at any time before the Vessel commences loading, it appears 455
~~that performance of the voyage would expose the Vessel or her Master 456
~~and crew or her cargo to war risks at any stage of the adventure, the 457
~~the Owners shall be entitled by letter or telegram despatched to the 458
~~Charterers, to cancel this Charter Party. 459

~~16.3. The Master shall not be required to load cargo or to continue 460
~~loading or to proceed on or to sign Bill(s) of Lading for any venture or 461
~~on which or any part of which it appears that the Vessel, her Master and 462
~~and crew or her cargo will be subjected to war risks. In the event of 463
~~the entries by the Master of his right under this Clause after part 464
~~or full cargo has been loaded, the Master shall be at liberty either 465

to discharge such cargo at the loading port or to proceed therewith. 466
In the latter case the Vessel shall have liberty to carry other cargo 467
for Owners' benefit and accordingly to proceed to and load or dis- 468
discharge such other cargo at any other port or ports whatsoever, 469
backwards or forwards, although in a contrary direction to or out of 470
or beyond the ordinary route. In the event of the Master electing to 471
proceed with part cargo under this Clause freight shall in any case 472
be payable on the quantity delivered. 473

16.4. If at the time the Master elects to proceed with part or full 474
cargo under Clause 16.3. or after the Vessel has left the loading port, 475
or the cost of the loading port, it more than one, it appears that the 476
further performance of the Charter Party will subject the Vessel, her 477
her Master and crew or her cargo, to war risks, the cargo shall be 478
discharged, or if the discharge has been commenced shall be com- 479
pleted, at any safe port in vicinity of the port of discharge as may be 480
or ordered by the Charterers. If no such orders shall be received with 481
from the Charterers within 48 hours after the Owners have despatched 482
a request by telegram or telex to the Charterers for the nomination 483
of a substitute discharging port, the Owners shall be at liberty to 484
discharge the cargo at any safe port which they may in their discre- 485
tion decide on and such discharge shall be deemed to be due ful- 486
fillment of the Charter Party. In the event of cargo being discharged 487
at any such other port the Owners shall be entitled to freight as if the 488
the discharge had been effected at the port or ports named in the 489
Bill(s) of Lading or to which the Vessel may have been ordered 490
pursuant thereto. 491

16.5. (a) The Vessel shall have liberty to comply with any directions 492
or recommendations as to loading, departure, arrival, routes, ports 493
of call, stoppages, destination, zones, waters, discharge, delivery or 494
in any other way whatsoever (including any direction or recommen- 495
dation not to go to the port of destination or to delay proceeding 496
thereto or to proceed to some other port) given by any Government 497
or by any belligerent or by any organized body engaged in civil war, 498
hostilities or warlike operations or by any person or body acting or 499
purporting to act as or with the authority of any Government or bel- 500
ligerent or of any such organized body or by any committee or person 501
having under the terms of the war risks insurance on the Vessel, the 502
right to give any such directions or recommendations. If, by reason 503
of or in compliance with any such direction or recommendation, any- 504
thing is done or is not done such shall not be deemed a deviation. 505
(b) If, by reason of or in compliance with any such direction or 506
recommendation, the Vessel does not proceed to the port or ports 507
named in the Bill(s) of Lading or to which she may have been 508
ordered pursuant thereto, the Vessel may proceed to any port as 509
directed or recommended or to any safe port which the Owners 510
their discretion may decide on and there discharge the cargo. Such 511
discharge shall be deemed to be due fulfillment of the Charter Party 512
and the Owners shall be entitled to freight as if discharge had been 513
effected at the port or ports named in the Bill(s) of Lading or to 514
which the Vessel may have been ordered pursuant thereto. 515

16.6. All extra expenses (including insurance costs) involved in dis- 516
charging cargo at the loading port or in reaching or discharging the 517
cargo at any port as provided in Clauses 16.4. and 16.5.(b) hereof 518
shall be paid by the Charterers and/or cargo owners, and the Owners 519
shall have a lien on the cargo for all moneys due under these 520
Clauses. 521

17. Lien 522

The Owners shall have a lien on the cargo for freight, deadfreight, 523
demurrage and damages for detention. The Charterers shall remain 524
responsible for deadfreight and demurrage (including damages for 525
detention), incurred at port of loading. The Charterers shall also 526
remain responsible for freight and demurrage (including damages 527
for detention) incurred at port of discharge, but only to such extent 528
as the Owners have been unable to obtain payment thereof by exer- 529
cising the lien on the cargo. 530

18. Liberty 531

The Vessel shall have liberty to sail with or without pilots, to tow or 532
go to the assistance of vessels in distress, to call at any port or 533
place for oil fuel supplies, and to deviate for the purpose of saving 534
life or property, or for any other reasonable purpose whatsoever. 535

19. Both-to-Blame Collision Clause 536

If the Vessel comes into collision with another vessel as a result 537
of the negligence of the other vessel and any act, neglect or default 538
of the Master, mariner, pilot or the servants of the Owners in the 539
navigation or in the management of the Vessel, the owners of the cargo 540
carried hereunder will indemnify Owners against all loss or liability 541
to the other or non-carrying vessel or her Owners in so far as such 542
loss or liability represents loss of, or damage to, or any claim what- 543
soever of the owners of said cargo, paid or payable by the other or 544
non-carrying vessel or her Owners to the owners of said cargo and 545

This document is a computer generated OREVOY form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

PART II
"OREVOY" Charter Party

set-off, recouped or recovered by the other or non-carrying vessel 546
or her Owners as part of their claim against the carrying vessel or 547
Owners. 548
The foregoing provisions shall also apply where the owners, ope- 549
rators or those in charge of any vessel or vessels or objects other 550
than, or in addition to, the colliding vessels or objects are at fault 551
in respect of a collision or contact. 552

20. General Average and New Jason Clause 553

General Average shall be adjusted and settled at the place indicated 554
in Box 30 according to the York/Antwerp Rules, 1974, or any modi- 555
fication thereof, but if, notwithstanding the provisions specified in 556
Box 30, the adjustment is made in accordance with the law and 557
practice of the United States of America, the following clause shall 558
apply: 559
"In the event of accident, danger, damage or disaster before or after 560
the commencement of the voyage, resulting from any cause what- 561
soever, whether due to negligence or not, for which, or for the con- 562
sequence of which, Owners are not responsible, by statute, contract 563
or otherwise, the goods, shippers, consignees or owners of the goods 564
shall contribute with Owners in general average to the payment of 565
any sacrifices, losses or expenses of a general average nature that 566
may be made or incurred and shall pay salvage and special charges 567
incurred in respect of the goods. If a salving Vessel is owned or 568
operated by Owners, salvage shall be paid for as fully as if the said 569
salving Vessel or vessels belonged to strangers. Such deposit as 570
Owners, or their agents, may deem sufficient to cover the estimated 571
contribution of the goods and any salvage and special charges 572
thereon shall, if required, be made by the goods, shippers, con- 573
signees or owners of the goods to Owners before delivery". 574

21. Responsibilities and Immunities 575

21.1.1. The Hague Rules contained in the International Convention 576
for the Unification of certain rules relating to Bills of Lading, dated 577
Brussels the 25th August 1924 as enacted in the country of shipment 578
shall apply to this Contract and to any Bill of Lading issued here- 579
under. 580
When no such enactment is in force in the country of shipment, the 581
corresponding legislation of the country of destination shall apply, 582
but in respect of shipments to which no such enactments are com- 583
pulsorily applicable, the terms of the said Convention shall apply. 584

21.1.2. In trades where the International Brussels Convention 1924 as 585
amended by the Protocol signed at Brussels on February 23rd, 1968 586
- The Hague-Visby Rules - apply compulsorily, the provisions of the 587
respective legislation shall apply. 588

21.1.3. The Owners shall in no case be responsible for loss of or 589
damage to cargo howsoever arising prior to loading into and after 590
discharge from the Vessel or while the goods are in the charge of 591
another owner nor in respect of deck cargo and live animals. This 592
sub-clause shall not detract from the Owners' obligations under 593
Clause 4. 594

21.2. Save to the extent otherwise in this Charter Party expressly 595
provided, neither party shall be responsible for any loss or damage 596
or delay or failure in performance hereunder resulting from Act of 597
God, war, civil commotion, quarantine, strikes, lockouts, arrest or 598
restraint of princes, rulers and peoples or any other event what- 599
soever which cannot be avoided or guarded against. 600

22. Bills of Lading 601

22.1. Bills of Lading are to be signed as per the "Congenbill" "Orevoybill" 602
Bill of
Lading without prejudice to this Charter Party, and the Charterers 603
hereby indemnify the Owners against all liabilities that may arise 604
from the signing of Bills of Lading as presented to the extent that 605
the terms of such Bills of Lading impose more onerous liabilities 606
upon the Owners than those assumed by the Owners under the terms 607
of this Charter Party. 608
*After Owners' approval of drafted Bill of Lading, Owners authorize*
*Charterers to issue full set of Bill of Lading within 1 (one) working*
*day after shipment. Original Bill of Lading to be issued in Gibraltar.*
Neither the Owners nor their Servants shall be required to sign or 609
endorse Bills of Lading showing freight prepaid unless and until the 610
freight due to the Owners has actually been paid - *see also Clause 13.2.* 611

22.2. The Master may be required to sign separate Bills of Lading 612
for cargo in different holds or for parcels properly separated upon 613
shipment by the Charterers or their Agents, the Owners not being 614
answerable for separate delivery, nor for the cost of cargo short- 615
delivered (if any) provided all the cargo taken on board is delivered. 616

23. Law and Arbitration 617

23.1. Unless otherwise agreed in Box 31, this Charter Party shall be 618
governed by English Law and any dispute arising out of this Charter 619
Party or any Bill of Lading issued thereunder shall be referred to 620
arbitration in London, one arbitrator being appointed by each party, 621
in accordance with the Arbitration Acts 1950 and 1979 or any statutory 622
modification or re-enactment thereof for the time being in force. 623
On the receipt by one party of the notification in writing of the 624
appointment of the other party's arbitrator, that party shall appoint 625
their arbitrator within fourteen days failing which the decision of the 626
single arbitrator appointed shall apply. If two arbitrators properly 627
appointed shall not agree they shall appoint an umpire whose de- 628
cision shall be final. 629

~~23.2. If agreed and stated in Box 31, this Charter Party shall be 630
governed by U.S. Law and all disputes arising out of this Charter 631
Party or any Bill of Lading issued thereunder shall be arbitrated at 632
New York in the following manner: 633
One arbitrator is to be appointed by each of the parties hereto and 634
a third by the two so chosen. Their decision or that of any two of 635
them shall be final, and for the purpose of enforcing any award, this 636
agreement may be made a rule of the court. The arbitrators shall be 637
commercial men. Such arbitration is to be conducted in accordance 638
with the rules of the Society of Maritime Arbitrators, Inc. 639
For disputes where the total amount claimed by either party does 640
not exceed U.S. $ 2,500.00, or an amount as mutually agreed, the 641
arbitration may be conducted in accordance with the Simplified Arbi- 642
tration Procedure of the Society of Maritime Arbitrators Inc. if so 643
desired by both parties. 644~~

~~23.3. If agreed and stated in Box 31, any disputes arising out of this 645
Charter Party or any Bill of Lading issued thereunder shall be re- 646
ferred to arbitration at the place or before the arbitration tribunal 647
indicated in Box 31, subject to the law and procedures applicable 648
there. 649~~

24. Brokerage 650

24.1. The brokerage as stated in Box 32 on freight and deadfreight *and* 651
*demurrage,*
shall be paid by the Owners and is deemed to be earned by the 652
Brokers upon shipment of cargo. 653

~~24.2. In case of cancellation pursuant to Clause 2.3., at least one 654
third of the brokerage on the estimated amount of freight shall be 655
paid by the Owners as indemnity to the Brokers. 656~~

*EdH/cp634/2009-handy*

This document is a computer generated OREVOY form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made in the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

# Additional Clauses
# to
# Charter Party m/v "BIC CLARE"

### dated Gibraltar, 12 May 2009

**Clause 25    Grab Discharge**
Vessel is guaranteed to be suitable for grab discharge. If any cargo is loaded in tweendecks, deeptanks or bunkers, any extra trimming etc. incurred for cargo not accessible to grabs and any time lost in discharging to be for Owners' account. Deeptanks, tunnels, sounding pipes and all other provisions and equipment within vessel's holds to be adequately protected against damages by receivers' grab-discharging and shovel loaders, failing which, Owners to be responsible for any consequences.

**Clause 26    Stevedore Damage**
Any stevedore damage at loading and/or discharging to be settled between Owners and stevedores directly, however, in case Owners can not settle directly, Charterers to interfere and assist Owners wherever possible.

**Clause 27    ISM Code**
Owners guarantee that this vessel complies fully with the ISM Code and is in possession of a valid Safety Management Certificate and will remain so the entirety of her employment under this Charter Party. The Owners to provide Charterers with satisfactory evidence of compliance if required to do so and to remain fully responsible for any and all consequences arising directly from any matters arising in connection with this vessel and the ISM Code.

**Clause 28    Banking Details**
Owner's bank account:

Account Name: TTMI Sàrl
Account Number: 1088103
Bank: JP Morgan Chase Bank
Location: New York, New York, USA
Swift Code: CHASUS33
ABA#: 021000021

Ref: BIC Clare freight

**Clause 29**

The freight is payable 100 % within 3 (three) banking days after signing / releasing Bill(s) of Lading marked "freight payable as per Charter Party dated 12 May 2009" to Owners' nominated bank account against Owners' email or fax freight invoice. Owners' original invoice to follow. In case Charterers require Bill(s) of Lading to be marked "Freight prepaid" same to be released once freight has been received by the Owners.

Freight deemed earned upon cargo loaded on board non-returnable irrespective of vessel and/or cargo lost or not lost.

Demurrage / Despatch to be settled after right and true delivery.

**Clause 30**

If the original Bills of Lading are not available at the port of discharge, if requested by Charterers, the Owners will allow the cargo to be discharged without presentation of original Bills of Lading against a single Letter of Indemnity as per Owners' P & I Club wording, signed by Charterers.

**Clause 31    Vessel's Description**

MV "BIC CLARE"
(ex Alegro II - ex Vancouver Spirit)
obo singledecker double hull.
Bahamas flag - built 08/1992 - S. Korea
103.203 mt dwat on 14,817m ssw - TPC 89,97
Loa/beam 243,57/42.00
7 holds / 7 hatches
total cubic capacity - grain: 124,308,9 cbm
All details 'about'

**Clause 32    Notices**

Notices for loading:
Master/Owners to give to agents, shippers or their representative notices of vessel's ETA on fixing then 48/24/4 hours.

Owners or Captain to telegraph to:
Charterers as well as Agents

Owners confirm that they have checked all the restrictions at loading port and have satisfied themselves that the vessel will be suitable in all respects for loading in Yuzhny.

Notices for discharging:
Notices for discharge and provided discharge port is known to be given to Charterers as well as Agents:
1. Upon commencement of loading stating time of commencement and quantity to be loaded;

2. Upon completion of loading stating quantity loaded, time of sailing and ETA discharging port;
3. 48/24 hours ETA discharging port.

### Clause 33

Laytime at loading port shall commence 12 hrs after written NOR has been given unless used in which case actual time used to count.

Laytime / demurrage at loading port shall stop counting on completion of loading operations and final draft survey for determination of cargo weight.

Laytime at discharge port shall commence 12 hrs (unless used in which case actual time used to count) after written NOR tender to agents, receivers or their representative at any given time, irrespective of official hours, Saturdays, Sundays and Holidays included, whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not, provided the vessel is ready to discharge cargo in every respect.

Laytime non reversible.

Both at loading and discharging ports any shifting time from waiting area/berth to final loading and discharging berths and any waiting for first suitable tide not to count as laytime, even if the vessel is already on demurrage.

Actual time used before commencement of laydays, if any, to count as laytime.

Time lost due to ballasting / deballasting of the vessel shall not count as laytime used.

### Clause 34    Agents

Charterers' agents to be appointed by Owners at loading port and at discharging ports.

Agent at loading port: to be advised later on.

Agent at discharging port: to be advised later on

### Clause 35    Clean on board Bill(s) of Lading

Clean on board Bill(s) of Lading to be released immediately after completion of loading of the parcel covered by such Bill(s) of Lading. For clean on board Bill(s) of Lading, if Master inserts remarks in Mate Receipts, Charterers to supply Owners with Letter of Indemnity (in Owners P & I Club wording) signed and stamped by Charterers only.

After Owners approved of draft Bill(s) of Lading Owners to authorize Charterers or Their Agents to issue full set of Bill(s) of Lading at owners/master behalf within 1 (one) working day after shipment.

### Clause 36    WAR RISKS CLAUSE FOR VOYAGE CHARTERING, 1993 (Code Name: VOYWAR 1993)

(1)    For the purpose of this Clause, the words:

(a)    "Owners" shall include the Shipowners, bareboat Charterers, Disponent Owners, managers or  other operators who are charged with the management of the vessel, and the Master; and

(b)    "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the

*Additional Clauses to Charter Party m/v "BIC CLARE" dated Gibraltar, 12 May 2009*
*Page 3 of 5*
*Edit/ep034/2009-kundy*

laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2)    If at any time before the vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the vessel, her cargo, crew or other persons on board the vessel to war risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the vessel, her cargo, crew or other persons on board the vessel to war risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the vessel, her cargo, crew, or other persons onboard the vessel may be exposed, or may be likely to be exposed, to war risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3)    The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo (or any part thereof), crew or other persons on board the vessel (or any one or more of them) may be, or are likely to be, exposed to war risks.  If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4)    If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo, crew or other persons on board the vessel may be, or are likely to be, exposed to war risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is

another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5)    The vessel shall have liberty:-
(a)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(b)    to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c)    to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d)    to discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(e)    to call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(f)    where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6)    If in compliance with any of the provisions of sub-Clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

**Clause 37**
All terms/conditions of this fixture to remain strictly private and confidential.

THE OWNERS:                                    THE CHARTERERS:

TTMI SARL
15-17, Rue du Cendrier
Case postale 2078
1211 GENEVE 1

~ ATTORNEY IN FACT

Additional Clauses to Charter Party m/v "BIC CLARE" dated Gibraltar, 12 May 2009
Page 5 of 5
EdH/cp034/2009-handy

# EXHIBIT B

**T.T.M.I. Sarl**
15 -17 Rue du Cendrier
CP 2078 – 1211 GENEVA 1

17-Sep-09

```
Vessel:         M/V BIC CLARE
D. Owner:       TTMI SARL
Charterer:      Ferrous Metal Company Ltd.
C/P dt:         12-May-09
Our ref:        BIC Clare/FMC - 1611964
```

```
Despatch at loadport:           48,140.99
Demurrage at disport:          489,863.00
less addcomm on dem:            12,246.58
```

```
Amount due to Owners(US$):     429,475.44
```

payment due : upon receipt of invoice

payable in us dollars by telegraphic transfer to :

**USD Wire Instructions for TTMI Sàrl**

Account Name: TTMI Sàrl

Account Number: ████████

Bank: JP Morgan Chase Bank

Location: New York, New York, USA

Swift Code: CHASUS33

ABA #: 021000021

Ref: BIC Clare - demurrage

TTMI SARL
15-17, Rue du Cendrier
Case postale 2078
1211 GENEVE 1